1  DANIEL H. BLOMBERG (admitted pro hac vice)
   ERIC S. BAXTER (admitted pro hac vice)
2  DIANA M. VERM (admitted pro hace vice)
   THE BECKET FUND FOR RELIGIOUS LIBERTY
3  1200 New Hampshire Ave. NW, Suite 700
   Washington, DC 20036
4  Telephone: (202) 955-0095
   Fax: (202) 955-0090
5  dblomberg@becketlaw.com
6
   KEVIN S. WATTLES (Cal. State Bar. No. 170274)
7  kwattles@slfesq.com
   SOLTMAN, LEVITT, FLAHERTY & WATTLES LLP
8  90 E. Thousand Oaks Boulevard, Suite 300
   Thousand Oaks, California 91360
9  Telephone: (805) 497-7706
   Fax: (805) 497-1147
10
11 *Attorneys for Defendants*

12                 UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 | JOANNA MAXON, *et al*., | No. 2:19-cv-09969-CBM-MRW |

15          Plaintiffs,              **MEMORANDUM OF POINTS AND
16                                    AUTHORITIES IN SUPPORT OF
      v.                             MOTION TO DISMISS PLAIN-
17                                   TIFFS' FIRST AMENDED COM-
                                     PLAINT**
18 FULLER THEOLOGICAL
   SEMINARY, *et al.*,              (Notice of Motion and Motion; Request
19                                   for Judicial Notice; Declaration of Dan-
          Defendants.                iel H. Blomberg; and (Proposed) Order
20                                   Filed Concurrently)
21                                   Date: April 14, 2020
                                     Time: 10:00 am
22                                   Dept: Courtroom 8B
                                     Judge: Honorable Consuelo B. Marshall
23

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND ..............................................................1

ARGUMENT ...................................................................................6

I.    Plaintiffs fail to state a claim under Title IX ............................6

A. Title IX does not apply to individuals ...................................6

B. Title IX does not apply to religious schools
    with religious objections ......................................................6

    1.  The Seminary is "controlled by" a religious
       organization.....................................................................6

    2.  Applying Title IX is not consistent with Fuller's
       religious tenets ...............................................................8

C. Title IX does not apply to discrimination based on
    sexual orientation ................................................................9

II.    Plaintiffs' Title IX claims violate the Religion Clauses...........11

III.   Plaintiffs' Title IX claims are barred by the freedom
     of association ......................................................................15

IV.   Plaintiffs' Title IX claims are barred by RFRA .....................17

V.    Plaintiffs' state-law claims must be dismissed........................18

A. Plaintiffs' Unruh Act claims must be dismissed ..................19

    1.  The Seminary is not a "business establishment." ............19

    2.  The Unruh Act does not have extraterritorial reach.......20

B. Brittsan's statutory claims are time-barred ........................20

C. Plaintiffs' IIED claims must be dismissed ..........................21

ii

D. Plaintiffs' breach of contract claims must be dismissed ....................22

E. Plaintiffs' fraud claims must be dismissed..........................................23

F. Plaintiffs' EHEA claims must be dismissed .......................................23

CONCLUSION ...........................................................................................25

CERTIFICATE OF SERVICE ...................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AHDC v. City of Fresno*,
  433 F.3d 1182 (9th Cir. 2006) ............................................................ 15

*Alcazar v. Corporation of the Catholic Archbishop of Seattle*,
  627 F.3d 1288 (9th Cir. 2010) ............................................................ 14

*Altitude Express, Inc. v. Zarda*,
  No. 17-1623 ........................................................................................ 10

*Ammons v. N. Pac. Union Conf. of Seventh-Day Adventists*,
  139 F.3d 903 (9th Cir. 1998) .............................................................. 13

*Apilado v. N. Am. Gay Amateur Athletic All.*,
  792 F. Supp. 2d 1151 (W.D. Wash. 2011) ......................................... 15

*Askew v. Trs. of Gen. Assemb.*,
  644 F. Supp. 2d 584 (E.D. Pa. 2009) ................................................. 13

*Blades v. Wells Fargo Bank NA*,
  2012 WL 2885133 (D. Nev. July 12, 2012) ....................................... 22

*Bostock v. Clayton Cty., Ga.*,
  No. 17-1618 ........................................................................................ 10

*Bouldin v. Alexander*,
  82 U.S. 131 (1872) ............................................................................. 13

*Boy Scouts v. Dale*,
  530 U.S. 640 (2000) ............................................................... 15, 16, 17

*Burwell v. Hobby Lobby Stores*,
  573 U.S. 682 (2014) ........................................................................... 17

*Cabading v. Calif. Baptist Univ.*,
  No. RIC1302245 (Cal. Super. Ct. July 11, 2014)   ........................... 19

*Calvary Christian Sch. v. Huffstuttler*,
  238 S.W.3d 58 (Ark. 2006) ...................................................................12

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir 2006) .........................................................16, 17

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999)...............................................................................6

*Doe v. Calif. Lutheran High Sch. Ass'n*,
  88 Cal. Rptr. 3d 475 (Ct. App. 2009) ..................................................19

*Doe v. Kamehameha Sch.*,
  470 F.3d 827 (9th Cir. 2006) ........................................................16, 17

*Doe v. Univ. of S. Cal.*,
  2019 WL 4228371 (C.D. Cal. Apr. 18, 2019) ....................................20

*In re Episcopal Sch.*,
  556 S.W.3d 347 (Tex. Ct. App. 2017).................................................18

*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009)................................................................................6

*Flynn v. Estevez*,
  221 So. 3d 1241 (Fla. Dist. Ct. App. 2017)........................................12

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005) .........................................................................21

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019)..........................................8, 9, 12

*Grussgott v. Milwaukee Jewish Day Sch.*,
  882 F.3d 655 (7th Cir. 2018) ...............................................................15

*Haynes v. Navy Fed. Credit Union*,
  825 F. Supp. 2d 285 (D.D.C. 2011).....................................................22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012)..............................................................13, 14, 16

*Hughes v. Pair*,
    209 P.3d 963 (Cal. 2009) ................................................................21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) ......................................................................15

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ........................................................20

*Karasek v. Regents of the Univ. of Calif.*,
    2015 WL 8527338 (N.D. Cal. Dec. 11, 2015) ...............................23

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952) ....................................................................11, 13

*Loving v. Princess Cruise Lines, Ltd.*,
    2009 WL 7236419 (C.D. Cal. Mar. 5, 2009) .................................20

*Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*,
    2007 WL 2206946 (S.D. Cal. July 27, 2007) ................................23

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004) ...........................................................7

*Montgomery v. Indep. Sch. Dist. No. 709*,
    109 F. Supp. 2d 1081 (D. Minn. 2000) .........................................11

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ......................................................................10

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) ......................................................18

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018) ..................................................................25

*Oasis W. Realty, LLC v. Goldman*,
    250 P.3d 1115 (Cal. 2011) ............................................................22

*Pacific Enters., LLC v. AMCO Ins. Co.*,
    2015 WL 56051 (D. Nev. Jan. 5, 2015) .........................................22

*Pakootas v. Teck Cominco Metals, LTD.*,
   830 F.3d 975 (9th Cir. 2016) ...........................................................9, 10

*Paul v. Watchtower Bible & Tract Soc'y*,
   819 F.2d 875 (9th Cir. 1987) ....................................................12, 13, 18

*Petruska v. Gannon Univ.*,
   2008 WL 2789260 (W.D. Pa. Mar. 31, 2008) ....................................14

*Potter v. Firestone Tire & Rubber Co.*,
   863 P.2d 795 (Cal. 1993) .........................................................21, 22

*Pugliese v. Superior Court*,
   146 Cal. App. 4th 1444 (2007) ...........................................................21

*Regents of Univ. of Calif. v. Bakke*,
   438 U.S. 265 (1978) ............................................................................17

*Riccio v. New Haven Bd. of Educ.*,
   467 F. Supp. 2d 219 (D. Conn. 2006) .................................................10

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) .....................................................................15, 17

*Schmoll v. Chapman Univ.*,
   70 Cal. App. 4th 1434 (Ct. App. 1999) ..............................................18

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) .....................................................................12, 14

*Shanks v. L-3 Commc'ns Vertex Aerospace*,
   2019 WL 5389892 (C.D. Cal. Oct. 21, 2019) ....................................21

*Spencer v. World Vision*,
   633 F.3d 723 (9th Cir. 2011) .............................................................13

*In re St. Thomas High Sch.*,
   495 S.W.3d 500 (Tex. App. 2016) ......................................................12

*Stanley v. Trs. of Cal. State Univ.*,
   433 F.3d 1129 (9th Cir. 2006) ...........................................................21

vii

*Stillwell v. City of Williams*,
   831 F.3d 1234 (9th Cir. 2016) .........................................................6

*Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
   2012 WL 5447959 (C.D. Cal. Oct. 4, 2012) .................................23

*Texas v. United States*,
   201 F. Supp. 3d 810 (N.D. Tex. 2016) ..........................................10

*Trinity Lutheran Church v. Comer*,
   137 S. Ct. 2012 (2017)..........................................................18, 25

*United Alloys v. Baker*,
   2010 WL 11515471 (C.D. Cal. Mar. 26, 2010)................................1

*United States v. Hoffman*,
   2020 WL 531943 (D. Ariz. Feb. 3, 2020) ................................17, 18

*United States v. Mongol Nation*,
   370 F. Supp. 3d 1090 (C.D. Cal. 2019) .........................................15

*Warner v. Tinder Inc.*,
   105 F. Supp. 3d 1083 (C.D. Cal. 2015) .........................................20

*Watson v. Jones*,
   80 U.S. (13 Wall.) 679 (1871) ..............................................11, 12

*Werft v. Desert Sw. Annual Conf. of United Methodist Church*,
   377 F.3d 1099 (9th Cir. 2004) ......................................................18

**Statutes**

18 U.S.C. § 249..............................................................................11

20 U.S.C. § 1681......................................................................*passim*

42 U.S.C. § 2000bb-1 ....................................................................17

42 U.S.C. § 12291 ..........................................................................11

Cal. Civ. Code § 51...................................................................*passim*

Cal. Civ. Proc. Code § 335.1 .....................................................20, 21

Cal. Educ. Code § 213 ...............................................................................24

Cal. Educ. Code § 66270 ...............................................................20, 21, 23

Cal. Educ. Code § 66271 ...................................................................23, 25

Cal. Educ. Code § 66278 ...............................................................................25

Cal. Educ. Code § 66272 ...............................................................................25

Cal. Educ. Code § 66290.1 ...........................................................................24

Cal. Educ. Code § 66290.2 ...........................................................................24

**Other Authorities**

118 Cong. Rec. 5808 (1972) .......................................................................10

44 Fed. Reg. 71413 (Dec. 11, 1979) ...........................................................10

81 Cal. Op. Att'y Gen. 189 (1998) ...............................................12, 16, 19

A.S. Singleton Memo (Feb. 1985) ...........................................................7, 8

H.R. 166, 94th Cong. (1975) .......................................................................11

H.R. 1652, 113th Cong. (2013) ...................................................................11

H.R. 2015, 110th Cong. (2007) ...................................................................11

H.R. 2074, 96th Cong. (1979) .....................................................................11

H.R. 2981, 111th Cong. (2009) ...................................................................11

H.R. 3185, 114th Cong. (2015) ...................................................................11

H.R. 4636, 103rd Cong. (1994) ...................................................................11

H.R. 14752, 93rd Cong. (1974) ...................................................................11

S. 439, 114th Cong. (2015) ..........................................................................11

S. 811, 112th Cong. (2011) ..........................................................................11

S. 1858, 114th Cong. (2015) ........................................................................11

S. 2081, 96th Cong. (1979) ........................................................................ 11

Jan. 18, 2017 Letter from Secretary Lhamon, (Jan. 18, 2017) ................................... 8

April 25, 2018 Letter from Ass't Secretary Jackson, (Apr. 25, 2018) ..................... 8

U.S. Dep't. of Educ., Exemptions from Title IX ........................................................ 7

x

# INTRODUCTION

This case presents a textbook violation of the First Amendment's separation of church and state. Plaintiffs' claims require this Court to second-guess a *seminary's* interpretation of its religious beliefs, override its judgment about religious membership and discipline, and control how it provides theological training to future religious leaders. Those are things no civil court can do.

That also explains why federal statutes like Title IX and state laws like the Unruh Civil Rights Act do not apply to religious schools in this context. Courts and enforcement agencies have consistently rejected attempts to use these laws and other common-law claims to entangle government in the religious admissions decisions of religious schools. There is no reason why this Court should be the first to rule otherwise. Instead, the Court should hold Plaintiffs to the agreement they made when they applied for admission: students who choose to join the Seminary's religious community to receive the Seminary's religious training must agree to abide by the Seminary's religious standards.

# FACTUAL BACKGROUND[1]

**The Seminary.** Fuller Theological Seminary is a California nonprofit religious corporation. Ex.1 at 2. The Seminary's Statement of Faith, which was included in its original 1951 articles of incorporation, is "the foundation upon which the seminary is based," "the defining principal within the [S]eminary's governing bylaws,"

---

[1]   Defendants dispute Plaintiffs' allegations. But for this motion, Defendants rely on the allegations in the FAC, documents incorporated by reference therein, and facts of which this Court may take judicial notice. *United Alloys v. Baker*, 2010 WL 11515471, at *2-3 (C.D. Cal. Mar. 26, 2010).

and "the unifying pillar supporting faculty governance." Ex.2 at 32. The Seminary is organized exclusively for, and its property is irrevocably dedicated to, religious purposes. Ex.1 at 1-2. Those purposes are "to establish, conduct, and maintain a seminary of religious learning to prepare men and women for the manifold ministries of Christ and his Church." *Id.* at 1; FAC ¶ 4; *accord* Ex.2 at 31. "In all of its activities, including instruction, nurture, worship, service, research, and publication, the [S]eminary strives for excellence in the service of Jesus Christ." Ex.2 at 31.

The Seminary's faculty, staff, and students are all expected to "believe that Jesus Christ . . . is the only ground for a person's reconciliation with God." *Id.* at 32. All students seeking admission must identify their denominational affiliation and the church that they attend, provide a reference from a pastor or denominational leader, and give their own religious autobiography. Ex.3 at 4-6; Ex.4 at 6-8.

**The Community Standards.** Part of the Seminary's religious training of students for "Christian service" includes developing their "moral character." Ex.2 at 1. The Board of Trustees for the Seminary accordingly established "ethical and behavioral standards" for all enrolled students and employees. *Id.*; *accord* Ex.5 at 1. These "community standards" are "guided by an understanding of Scripture and a commitment to its authority in all matters of Christian faith and living" and are part of its "core mission, values, and identity." Ex.2 at 32; *see also* Ex.2 at 1. They also reflect the Seminary's "respect [for] the moral tradition of the churches who entrust students" to the Seminary. Ex.2 at 1. The community standards are public, listed on Fuller's website, admissions materials, and academic catalogues. *See*, *e.g.*, Ex.2 at 1. All stu-

1    dents must agree to "continual adherence" to the community standards as "a contin-

2    uing condition of enrollment." Ex.3 at 6; Ex.4 at 8; Ex.2 at 1.

3        As relevant here, the community standards identify the Seminary's belief that

4    marriage "is the covenant union between one man and one woman," that "sexual

5    union must be reserved for marriage," that "all members of its community—students,

6    faculty, . . . and trustees—[must] abstain from what [the Seminary] holds to be un-

7    biblical sexual practices," and that homosexual conduct is among practices which it

8    considers to be "inconsistent with the teachings of Scripture." Ex.2 at 1. The stand-

9    ards explain that God "intended marriage to be an unconditional covenant between

10   a woman and a man" and that this "ideal" "must be reflected, however imperfectly,

11   in the lives of its faculty, administration, board, students, and staff." Ex.2 at 13-14.

12   Thus, while the Seminary expressly "does not discriminate based on sexual orienta-

13   tion" as such, it does require students to honor its religious commitments on sex and

14   marriage during their enrollment at the Seminary. FAC ¶ 191.

15       **The Plaintiffs.** Nathan Brittsan applied for admission to the Seminary in August

16   2017, seeking a Master of Divinity from the School of Theology. Ex.4 at 1. His

17   application stated that he was an associate pastor and licensed minister of Grace

18   Baptist Church, a member of the American Baptist Church USA. Ex.4 at 3-4. He

19   was pursuing ordination from his church, which required a Master of Divinity. *Id.* at

20   7. He said that he applied to the Seminary because it could "complete my spiritual

21   training" and "equip me for my future ministry endeavors." *Id.*

22       Brittsan signed the admissions form affirming his understanding that "continual

23   adherence" to the community standards was "a continuing condition of enrollment."

3

1   *Id.* at 8. He also affirmed that no part of his application contained "any misrepresen-

2   tation" or "material omission," and that he understood that he could be "denied ad-

3   mission, or if already admitted, . . . dismissed" if it did. *Id.* at 8.

4         In early September, before he had registered for classes, the Seminary realized

5   that Brittsan might be in a same-sex marriage and emailed him to arrange a time to

6   talk. Ex.6 at 7. The Seminary's director of admissions and an assistant dean of the

7   School of Theology spoke with him on September 19, addressing the community

8   standards violation and explaining that proceeding at the Seminary would not be

9   possible. Ex.7 at 1; Ex.6 at 3; FAC ¶ 87. Yet thirty minutes after the call, and instead

10  of abiding by his commitment of "continual adherence" to the standards, Brittsan

11  registered for classes at the Seminary. He then pushed for formal dismissal proceed-

12  ings before the School of Theology. Ex.6 at 3.

13        Because the Dean of the School of Theology was hospitalized, Defendant Mari

14  Clements was designated to decide the appeal, and she issued a decision of dismissal

15  on September 21. Ex.7 at 1. Clements stated that he was dismissed for violating the

16  community standards regarding sexuality and for failing to keep his agreement to

17  adhere to the standards, both of which reflected "the Seminary's sincerely held reli-

18  gious beliefs." *Id.* Brittsan appealed, acknowledging his doctrinal disagreement with

19  the Seminary and that it was "within the bounds of [Fuller's] internal policies to

20  dismiss [him]," but requesting that the Seminary would change its mind under "legal

21  and moral principle[s]." Ex.8 at 2. His dismissal was upheld, and Brittsan never ex-

22  ercised his right to appeal to the Fuller Board of Trustees. The Seminary reversed

23  any charges associated with class registration and refunded his application fee.

4

Almost a year later, Joanna Maxon was also dismissed for entering a same-sex marriage. Maxon had been admitted to the School of Theology at the Seminary's campus in Houston, Texas, in 2015. Ex.3 at 1. Her application said she was a member of a United Methodist Church in Texas, Ex.3 at 2, and explained that she believed she was "called into the mission of ministry" and wanted to obtain training from the Seminary to "do more both within the small group ministry of my local church, and beyond to possibly some other ministry I am not even aware of at this time." Ex.3 at 9. She initially enrolled in the Master of Arts in Theology and Ministry program, with an emphasis in Recovery Ministry. Ex.3 at 1.

Maxon signed the admissions form affirming her understanding that "continual adherence" to the community standards was "a continuing condition of enrollment." *Id.* at 6. Yet in August 2018, the Seminary became aware that Maxon had entered into a same-sex marriage sometime in 2016. FAC ¶¶ 26, 162; FAC Ex.1. When Boymook contacted Maxon on behalf of the Seminary, she confirmed that she had spent well over a year in violation of its community standards. FAC Ex.1. Maxon's explanation for the lapse was that she "forgot about the policy." Ex.9 at 2. On October 9, 2018, Maxon was dismissed from the Seminary due to her violation of the standards. Ex.10. The Seminary refunded any tuition paid for courses which she had started but was unable to complete. Ex.9 at 1. The October 9 letter informed Maxon of her right to appeal, which she did not exercise.

**The Lawsuit.** On November 21, 2019, Maxon filed suit against the Seminary and Thompson. Dkt. 1. On January 7, 2020, the Plaintiffs filed the FAC, adding Brittsan as a plaintiff and Clements and Boymook as Defendants. Dkt. 20.

5

**ARGUMENT**

**I. Plaintiffs fail to state a claim under Title IX.**

    **A. Title IX does not apply to individuals.**

    Title IX applies only to an "education program or activity" receiving federal funds. 20 U.S.C. § 1681(a). It does not apply "against school officials, teachers, [or] other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). Because enforcement "may only be exercised against the funding recipient," *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641 (1999), Count I must be dismissed against all of the individual Defendants. *Stillwell v. City of Williams*, 831 F.3d 1234, 1243 (9th Cir. 2016).

    **B. Title IX does not apply to religious schools with religious objections.**

    Title IX also "shall not apply to an educational institution which is controlled by a religious organization" if application would "not be consistent" with the organization's "religious tenets." 20 U.S.C. § 1681(a)(3). Because the Complaint admits that the Seminary is an educational institution under religious control, Plaintiffs have failed to state a claim that Title IX applies.

    **1. The Seminary is "controlled by" a religious organization.**

    Plaintiffs frankly and correctly allege that the Seminary is "religious in nature." FAC ¶ 4. Plaintiffs were both enrolled in its School of Theology, pursuing professions in religious academics and ministry. FAC ¶¶ 21, 29, 40. Because the Seminary is itself both an educational institution and a religious organization and is controlled by its religious board of trustees, the requirement of religious control is met.

The Complaint's acknowledgment of religious control is confirmed by the Seminary's Articles of Incorporation, which provide that Fuller is a "religious corporation" organized "to establish, conduct, and maintain a seminary of religious learning to prepare men and women for the manifold ministries of Christ and his Church." Ex.1 at 1. It is "operated exclusively for religious purposes" and its property is "irrevocably dedicated to religious purposes. *Id*. at 2.

The Seminary has a detailed Statement of Faith that serves as the "defining principle" and "unifying pillar" of the Seminary's governance. Ex.2 at 32. Its trustees, managers/administrators, and faculty are all required to subscribe and "bear concerted witness to" the Statement of Faith as "essential to their ministry" and "the foundation upon which the seminary is based." *Id*. Pursuant to this shared faith, the Seminary is "dedicated to the preparation of men and women for the manifold ministries of Christ and his Church." Ex.2 at 31; Ex.1 at 2.

The Department of Education is "the administrative agency charged with administering Title IX." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004). It has for decades confirmed that an educational institution that is "a school or department of divinity" that prepares students "to become ministers of religion," to enter "some other religious vocation," or "to teach theological subjects," or that requires its faculty or employees to "espouse a personal belief in" the religion "by which it claims to be controlled," meets the standard. *See* U.S. Dep't. of Educ., Exemptions from Title IX, https://perma.cc/FMJ8-VT9R (see drop-down field entitled *Private schools controlled by religious organizations*, citing A.S.

7

Singleton Memo (Feb. 1985), https://perma.cc/2P9F-W98H). Across political administrations, the Department has consistently acknowledged that seminaries like Fuller satisfy the "controlled by" standard.[2] Because the Complaint and other documents properly before the Court confirm that Fuller is a school of divinity, prepares students for religious ministry, and requires its trustees, administrators, and faculty to affirm and adhere to its statement of faith, the "controlled by" standard is met.

Plaintiffs' allegation that "Fuller has not applied for or received a religious exemption" from the Department, FAC ¶ 5, is irrelevant. The Department is explicit that "[a]n institution's exempt status is not dependent upon its submission of a written statement." *See* https://perma.cc/GDS6-YTAQ. Rather, the exemption is provided by the statute itself. 20 U.S.C. § 1681(a)(3).

### 2. Applying Title IX is not consistent with Fuller's religious tenets.

Title IX "require[s] dismissal" where an eligible religious organization "'offers a religious justification' for the adverse action or where the claim will otherwise 'pose too much intrusion into the religious [organization's] Free Exercise and Establishment Clause rights.'" *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 & n.5 (N.D. Ill. 2019) (citations omitted). For example, a claim of sexual-orientation discrimination "could not proceed" if it "was rooted in the Catholic church's doctrinal

---

[2]   *See, e.g.*, Letter from Assistant Secretary Jackson, (Apr. 25, 2018), https://perma.cc/L94N-FR97 (accepting statement of control by Dallas Theological Seminary because it is "controlled by the non-denominational Evangelical Christian interpretation of the Scriptures," "prepar[es] students for Christian ministry," and requires the Seminary faculty and board to "sign annually" a statement of faith and "adhere to essential doctrinal commitments"); Letter from Secretary Lhamon, (Jan. 18, 2017), https://perma.cc/P2RC-RGYM (accepting statement of control by Asbury Theological Seminary because it is "a school or department of divinity" and "both a school *and* an established religious organization"); *see also* U.S. Dep't of Ed., Office for Civil Rights, Other Correspondence, https://perma.cc/9MJ8-3RNM (posting all letters).

opposition to same-sex marriage," and a claim for sex discrimination could not proceed if "arising from a religious institution's complementarian policy" that excluded women from certain roles for religious reasons. *Id*. (citing cases).

Such is the circumstance here: Fuller's reasons for dismissing Plaintiffs were "rooted firmly in its religious beliefs." *Id*. at 872. Fuller's religious beliefs—as identified in the Complaint—are clear and unequivocal. "The seminary believes that sexual union must be reserved for marriage" and that marriage "is the covenant union between one man and one woman." FAC ¶ 191. The Seminary states that it "does lawfully discriminate on the basis of sexual conduct that violates" this "biblically based Community Standard." *Id*. And it expressly "expects members of its community to abstain from what it holds to be unbiblical sexual practices." *Id*.

Plaintiffs each signed statements in the admission process promising to abide by the Seminary's beliefs. Ex.3 at 6-7; Ex.4 at 8. Yet the Complaint admits that both Plaintiffs are in same-sex marriages and that their dismissals were "because of [these] same-sex marriage[s]." FAC ¶¶ 2-3, 26, 79-80. Because Plaintiffs' Title IX claim seeks to interfere with Fuller's religious beliefs and community standards concerning marriage and sexuality, application of Title IX "would not be consistent with [Fuller's] religious tenets" and "shall not apply." 20 U.S.C. § 1681(a)(3). Dismissal of the Title IX claims is thus required. *Moody Bible*, 412 F. Supp. 3d at 871.

### C. Title IX does not apply to discrimination based on sexual orientation.

Title IX provides that no person shall be subject to discrimination in education "on the basis of sex." 20 U.S.C. § 1681(a). Courts must give the term "sex" its "ordinary, contemporary, common meaning." *Pakootas v. Teck Cominco Metals, LTD.*,

830 F.3d 975, 980 (9th Cir. 2016). When Title IX passed, virtually every dictionary definition referred to the physiological distinctions between females and males. *Texas v. United States*, 201 F. Supp. 3d 810, 833 (N.D. Tex. 2016). This understanding of the term "sex" is reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. *See, e.g.*, 20 U.S.C. § 1681(a)(8). There is nothing about the text of Title IX that suggests "sex" refers to the entirely distinct concept of "sexual orientation." *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 225 (D. Conn. 2006).

This understanding of the term "sex" also fits with Title IX's purpose. Title IX was enacted at a time of pervasive discrimination in education against women. 44 Fed. Reg. 71413, at 71423 (Dec. 11, 1979). It grew out of a series of congressional hearings on discrimination against women. *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982). Its chief sponsor said it was "an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice . . . ." 118 Cong. Rec. 5808 (1972). Thus, Title IX's purpose was to ensure equal educational opportunities for women. There is no hint of any purpose to legislate on the basis of "sexual orientation."[3]

More importantly, both when Title IX was enacted, and ever since, Congress has

---

[3]   The Supreme Court currently has two cases pending that address whether "sex" under Title VII includes "sexual orientation." *Bostock v. Clayton Cty., Ga.*, No. 17-1618; *Altitude Express, Inc. v. Zarda*, No. 17-1623. But even if the Court were to answer "yes" in those cases, Title IX's narrow focus on the rights of women in education suggests a different result here.

1    treated "sex" and "sexual orientation" as distinct. Since the 1970s, Congress has re-

2    jected multiple proposals to add the category of "sexual orientation" to a variety of

3    nondiscrimination statutes, including Title IX,[4] while accepting other proposals.[5]

4    These actions show that Congress understands "sex" and "sexual orientation" to be

5    distinct and is fully capable of including both concepts when it wants to.

6         The term "sex" is not ambiguous. It refers to the biological differences between

7    males and females. Plaintiffs' attempt to make it mean something else fails. *Mont-*

8    *gomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1090 (D. Minn. 2000).

9    **II. Plaintiffs' Title IX claims violate the Religion Clauses.**

10        Plaintiffs ask this Court to be the first to impose Title IX over a seminary's reli-

11   gious judgment as to what its religious standards require, how it applies its religious

12   beliefs, and who it can train for ministry. Plaintiffs' request is barred by the First

13   Amendment's church autonomy doctrine, which provides that "civil courts exercise

14   no jurisdiction" over matters of "ecclesiastical government." *Watson v. Jones*, 80

15   U.S. (13 Wall.) 679, 733 (1871). For over a century, the church autonomy doctrine

16   has prevented courts from interfering in "matters of church government as well as

17   those of faith and doctrine," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116

18   (1952), including "theological controversy, church discipline, . . . or the conformity

19

20   [4]   **Civil Rights Act:** H.R. 14752, 93rd Cong. (1974); H.R. 166, 94th Cong. (1975); H.R. 2074,
     96th Cong. (1979); S. 2081, 96th Cong. (1979); H.R. 3185, 114th Cong. (2015); S. 1858, 114th
21   Cong. (2015); **Employment Nondiscrimination Act:** H.R. 4636, 103rd Cong. (1994); H.R. 2015,
     110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011); and **Title IX:**
22   H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

23   [5]   **Hate Crimes Prevention Act:** 18 U.S.C. § 249(a)(2) (2010); and **Violence Against Women
     Act:** 42 U.S.C. § 12291(b)(13)(A) (2013).

of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733. Courts have repeatedly applied this constitutional principal in the context of religious school admissions and discipline. *See, e.g.*, *Moody Bible*, 412 F. Supp. 3d at 872 (dismissing professor's Title IX claim); *Flynn v. Estevez*, 221 So. 3d 1241, 1251 (Fla. Dist. Ct. App. 2017) (dismissing admissions claim against school because the "Church's governance of its parochial schools is inherently religious"); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 512 & n.1 (Tex. App. 2016) (same; collecting cases); *Calvary Christian Sch. v. Huffstuttler*, 238 S.W.3d 58, 66-67 (Ark. 2006) (dismissing claims over religious school's dismissal of student); *see also* 81 Cal. Op. Att'y Gen. 189 (1998) ("Clearly, the operation of a private nonprofit religious school implicates constitutional rights of the free exercise of religion").

Plaintiffs' claims violate the Religion Clauses in three ways. *First*, they demand this Court rule that Fuller's beliefs about marriage are discriminatory and that its application of those beliefs in dismissing the Plaintiffs was illegal. FAC ¶¶ 202, 215. But civil courts cannot parse a seminary's sincere religious beliefs, disagree with its sincere religious judgments, second-guess its religious training commitments, or overrule its internal religious governance. Such analysis would do just what the First Amendment forbids: "deprive [Fuller] of the right of construing [its] own church laws." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976); *see also Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 879 (9th Cir. 1987) (dismissing civil suit challenging a religious group's "interpretation of canonical text" because courts "are not free to reinterpret that text."). Moreover, it is "well estab-

lished" that courts should avoid even beginning such analysis, since the "very pro-cess of inquiry" "runs counter to the 'core of the constitutional guarantee against religious establishment.'" *Spencer v. World Vision*, 633 F.3d 723, 731 (9th Cir. 2011) (O'Scannlain, J., joined by Kleinfeld, J., concurring) (citation omitted).

*Second*, the complaint asks this Court to overturn Fuller's religious discipline and membership standards. Courts have long understood that they "cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off." *Bouldin v. Alexander*, 82 U.S. 131, 139-40 (1872). The Seminary should be "afforded great latitude" in "impos[ing] discipline on mem-bers" of its own community. *Paul*, 819 F.2d at 883. To second-guess the Seminary's membership decisions here would both entangle the Court in the Seminary's reli-gious judgment about who it can train for ministry and force the Seminary to train students for ministry who reject its community standards. *Ammons v. N. Pac. Union Conf. of Seventh-Day Adventists*, 139 F.3d 903 (9th Cir. 1998) ("Disputes regarding matters of church discipline are not the proper subject of a civil court inquiry.").[6]

*Third*, the Title IX claim also violates the Religion Clauses' guarantee that "the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' *Kedroff*, 344 U.S. at 119—is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012). This guarantee, commonly described as the "ministerial exception," provides protection

---

[6] *Askew v. Trs. of Gen. Assemb.*, 644 F.Supp.2d 584, 594 n.8 (E.D. Pa. 2009) ("A school's decision to expel a student is akin to a church's decision to remove or discipline one of its members. The decision necessarily involves doctrinal criteria, and attempting to disentangle the doctrinal from the secular in this context is precisely what the *Watson-Gonzalez-Milivojevich* rule prohibits.").

for "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 196. *See Petruska v. Gannon Univ.*, 2008 WL 2789260, at *3-5 (W.D. Pa. Mar. 31, 2008) (dismissing Title IX claim).

The Ninth Circuit applies this principle to students training for the ministry. In *Alcazar v. Corporation of the Catholic Archbishop of Seattle*, the *en banc* court found that "First Amendment considerations relevant to an ordained minister apply equally to a person who, though not yet ordained, has entered into a seminary program to become a minister." 627 F.3d 1288, 1292 (9th Cir. 2010) (affirming grant of judgment on the pleadings). The court reasoned that the "principle of 'allowing the church to choose its representatives using whatever criteria it deems relevant' necessarily applies not only to those who are already ordained ministers, but also to those persons who are actively in the process of becoming ordained ministers." *Id.*

So too here. The Seminary's mission is to train students for ministry. Brittsan sought a Master of Divinity in order to obtain ordination in his church, "complete [his] spiritual training," and "equip [him] for [his] future ministry endeavors." Ex.4 at 7; FAC ¶ 3. Maxon likewise enrolled in the School of Theology with the purpose of preparing herself for some form of ministry. Ex.3 at 9; FAC ¶ 29.

Plaintiffs try two ways around these fatal defects. First, they argue that the Seminary did not follow its own procedures in dismissing them. That path has long been foreclosed. *See Hosanna-Tabor*, 565 U.S. at 187 (citing *Milivojevich*, 426 U.S. at 720). Then they argue that the Seminary is too ecumenical to receive protection, since it does not discriminate based on sexual orientation and accepts aspiring ministers from faiths that permit same-sex marriage. Courts have repeatedly rejected that

14

kind of argument, refusing to use a "school's promotion of inclusion as a weapon to challenge the sincerity of its religious beliefs." *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 658 (7th Cir. 2018) (collecting cases).

### III. Plaintiffs' Title IX claims are barred by the freedom of association.

Plaintiffs' claims are also barred by the First Amendment rights to expressive association and assembly. "An individual's freedom to speak [and] to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). This freedom of association "plainly presupposes a freedom not to associate," and thus protects against laws that "force[ a] group to accept members it does not desire." *Id.* at 623. Protecting this "right is crucial in preventing the majority from imposing its views on groups that would express other, perhaps unpopular, ideas." *United States v. Mongol Nation*, 370 F. Supp. 3d 1090, 1101 (C.D. Cal. 2019) (quoting *Boy Scouts v. Dale*, 530 U.S. 640, 647-48 (2000)). Thus, the "exercise of these constitutional rights is not deprived of protection if the exercise is not politically correct and even if it is discriminatory against others." *AHDC v. City of Fresno*, 433 F.3d 1182, 1198 (9th Cir. 2006).

As relevant here, the First Amendment protects the rights of groups to exclude individuals who undermine the groups' message on sexuality or marriage. *Dale*, 530 U.S. at 659; *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 581 (1995). Thus, for instance, courts have found that a gay softball league can exclude straight players, *Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151, 1161-62 (W.D. Wash. 2011), and that religious groups can exclude individuals

15

who reject their beliefs on same-sex marriage, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 862-63 (7th Cir 2006). The rights of free association and assembly also protect school admissions decisions. *Hosanna-Tabor*, 565 U.S. at 189 (noting EEOC concession that "it would violate the First Amendment for courts . . . to compel the ordination of women . . . by an Orthodox Jewish seminary"); 81 Cal. Op. Att'y Gen. 189, at *3, *7 (noting associational and assembly implications).

To decide if the right of association is implicated, courts must determine whether the group "engage[s] in some form of expression, whether it be public or private," and if the law at issue "significantly affect[s] the [organization's] ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648-50.

*First*, the Seminary engages in "some form of expression." It exists solely to provide "religious learning to prepare men and women for the manifold ministries of Christ and his Church." Ex.1 at 1. Moreover, its community standards were specifically delineated "to speak clearly" and avoid "confusion" about its moral commitments and to expressively "model[ ]" its faith for society. Ex.2 at 1, 21, 31.

These associational interests are near their peak here because this case concerns both religious *and* academic associational interests. The First Amendment "gives special solicitude to the rights of religious organizations," *Hosanna-Tabor*, 565 U.S. at 189, in part because their "very existence is dedicated to the collective expression and propagation of shared religious ideals," making them "the archetype of associations formed for expressive purposes," *id.* at 200 (Alito, J., joined by Kagan, J., concurring). The First Amendment also accords institutions of higher education significant "educational autonomy," *Doe v. Kamehameha Sch.*, 470 F.3d 827, 841 (9th

16

Cir. 2006) (en banc), including in its "selection of its student body," *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 312 (1978) (the "essential freedoms of a university" include "determin[ing] for itself . . . who may be admitted to study" (cleaned up)).

*Second*, punishing the Seminary holding certain religious beliefs about marriage and human sexuality would "significantly affect the [Seminary's] ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 650. Courts must "give deference to an association's view of what would impair its expression." *Id.* at 653. But here, the harm is plain: punishing the Seminary undermines its ability to establish moral standards for ministry training. That is precisely the kind of "interfer[ence] with the internal organization or affairs of the group" forbidden by the right of expressive association. *See Walker*, 453 F.3d at 861 (quoting *Roberts*, 468 U.S. at 623).

## IV.   Plaintiffs' Title IX claims are barred by RFRA.

The Religious Freedom Restoration Act ("RFRA") provides "'very broad protection for religious liberty'" by exempting religious objectors from federal laws that substantially burden the exercise of their religious beliefs. *United States v. Hoffman*, ---F. Supp. 3d---, 2020 WL 531943, at *3 (D. Ariz. Feb. 3, 2020) (quoting *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 693 (2014)). Under RFRA, such substantial burdens are permissible only if they are the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

RFRA forecloses Plaintiffs' Title IX claims because they would substantially burden the Seminary's exercise of religion. A "substantial burden" is established either when religious groups are "coerced to act contrary to their religious beliefs by the threat of civil . . . sanctions" or "forced to choose between following the tenets

17

of their religion and receiving a government benefit." *Hoffman*, 2020 WL 531943, at *8 (quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008)). Here, Plaintiffs' theory of Title IX would make enforcing the Seminary's community standards an "unlawful act" subject to open-ended civil sanctions, including millions of dollars in claimed damages, all of which "would directly restrict the free exercise of the [Seminary's] religious faith." *Paul*, 819 F.2d at 881. And it would force the Seminary to either give up access to students relying on federal aid—thus imposing the burden of cutting them off from co-religionists seeking theological training—or give up their religious practices. *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012, 2022 (2017) (conditioning even a "gratuitous benefit" on violating religious beliefs will "inevitably deter[] or discourage[] the exercise of First Amendment rights"). If this Court grants Plaintiffs' claim, "'the pressure . . . to forego th[ose] practice[s] [would be] unmistakeable'" and would thus constitute "a substantial burden." *Paul*, 819 F.2d at 881-82 & n.6.

Nor can Plaintiffs justify that burden. There is no government interest, much less a compelling one, in controlling how a seminary trains its students for ministry.

**V.    Plaintiffs' state-law claims must be dismissed.**

Plaintiffs' state-law claims are barred by the Religion Clauses and the freedom of association. *Werft v. Desert Sw. Annual Conf. of United Methodist Church*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004) (Religion Clauses apply equally to "federal and state law claims"); *Schmoll v. Chapman Univ.*, 70 Cal. App. 4th 1434, 1444 (Ct. App. 1999); *In re Episcopal Sch.*, 556 S.W.3d 347, 357 (Tex. Ct. App. 2017) (Religion Clauses bar "breach of contract and tort" claims "regarding whether [a student]

should be a member of the school community"). In any event, if it dismisses the Title IX claims, this Court should decline to exercise supplemental jurisdiction over the state law claims. There are also other reasons to dismiss each of the state law claims.

### A. Plaintiffs' Unruh Act claims must be dismissed.

#### 1. The Seminary is not a "business establishment."

Religious educational institutions with an overall purpose and function of inculcating their students with a specific set of values are not "business establishments" under the Unruh Act. *Doe v. Calif. Lutheran High Sch. Ass'n*, 88 Cal. Rptr. 3d 475, 483 (Ct. App. 2009). *See also* 81 Ops. Cal. Att'y Gen. 189 n.6 (1998) ("legislative history of the Act" shows that "Legislature intended to exclude religious schools"); *Cabading v. Calif. Baptist Univ.*, No. RIC1302245, slip op. at 4-5 (Cal. Super. Ct. July 11, 2014) (Baptist university not a "business establishment") (Ex. 11). The Seminary is perhaps the quintessential example of such a religious institution. Literally "all of its activities" are geared toward "prepar[ing] men and women" for "the service of Jesus Christ." Ex.2 at 31; Ex.1 at 1-2. Nor do Plaintiffs' allegations that the Seminary charges tuition and competes in the marketplace to attract students, faculty, and revenue, FAC ¶¶ 67-69, change that result. Such allegations cannot convert a religious school into a "business establishment" under the Act. *Calif. Lutheran*, 88 Cal. Rptr. 3d at 484 ("[E]ven a private organization must have some source of funding for 'the basic activities or services' that it offers."); Ex.11 at 6, *Calif. Baptist Univ.*, No. RIC1302245 ("[A]ncillary business operations" do not bring "core associational and educational functions within the scope of the Act.").

### 2.  The Unruh Act does not have extraterritorial reach.

Maxon's status as a Texas resident provides an independent basis for dismissing her Unruh Act claim. FAC ¶¶ 14, 21, 43. On its face, the Act only applies to persons suffering discrimination "within" California's borders. Cal. Civ. Code § 51. It is thus "well-settled that the Unruh Act applies only within California" and does not "have extraterritorial reach." *Loving v. Princess Cruise Lines, Ltd.,* 2009 WL 7236419, at *8 (C.D. Cal. Mar. 5, 2009); *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1087–88, 1099 (C.D. Cal. 2015) (irrelevant that "alleged discrimination was approved by defendants' [employees] in California").

Maxon primarily took online courses or courses at Fuller's campus in Houston. FAC ¶¶ 21, 43. There is not a single allegation that Maxon was ever "within the jurisdiction of" California. Cal. Civ. Code § 51; FAC ¶¶ 14, 21, 43. The Unruh Act simply does not apply to out-of-state plaintiffs alleging discrimination by California businesses and individuals. *See Tinder*, 105 F. Supp. 3d at 1087-88, 1099.

### B. Brittsan's statutory claims are time-barred.

Claims may be dismissed as time-barred if it is apparent from the complaint that the limitations period has run. *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). Brittsan's Unruh Act and Equity in Higher Education Act ("EHEA") claims have two-year statutes of limitations. Cal. Civ. Proc. Code § 335.1; *Doe v. Univ. of S. Cal.*, 2019 WL 4228371, at *3 (C.D. Cal. Apr. 18, 2019).

Brittsan's claims under the Unruh Act and the EHEA both accrued no later than September 28, 2017, when he sent an appeal letter to Acting Dean Bryant Myers, indicating that "Title IX's prohibition on sex discrimination applied to his situation

20

1    and . . . he believed there was a legal and moral imperative for Fuller to allow him

2    to remain a student." FAC ¶¶ 102, 107. At this point, Brittsan *knew* of the alleged

3    injury, along with the cause and the attendant harms, that forms the basis of his Un-

4    ruh Act and EHEA claims. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797,

5    806 (2005). Because Brittsan did not file his complaint until January 7, 2020, the

6    Unruh Act and EHEA claims are time-barred.[7]

7                    **C. Plaintiffs' IIED claims must be dismissed.**

8         For an intentional infliction of emotional distress ("IIED") claim, Plaintiffs must

9    establish "extreme and outrageous conduct by the defendant[.]" *Hughes v. Pair*, 209

10   P.3d 963, 976 (Cal. 2009). Conduct will only be considered "outrageous" when it is

11   "so extreme as to exceed all bounds of that usually tolerated in a civilized commu-

12   nity." *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 819 (Cal. 1993).

13        Maxon alleges three facts in support of her IIED claim: (1) Fuller dismissed her

14   because of her same-sex marriage; (2) Fuller misused confidential information from

15   her tax return; and (3) Boymook failed to disclose that Brittsan had been dismissed

16   a year earlier for the same reason. FAC ¶¶ 245(a)–(d). Brittsan's sole surviving IIED

17   allegation is Fuller's refusal to provide requested documents. FAC ¶¶ 154, 245(e);

18   *see also* Cal. Civ. Proc. Code § 335.1; *Pugliese v. Superior Court*, 146 Cal. App. 4th

19   1444, 1450 (2007); *Shanks v. L-3 Commc'ns Vertex Aerospace*, 2019 WL 5389892,

20

21

22   [7] Brittsan's Title IX claim is also time-barred. Under federal law, the Title IX two-year limitations period begins to run "when a plaintiff knows or has reason to know of the injury which is the basis for the action." *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006). Here, that

23   is Brittsan's dismissal, which occurred more than two years before he sued.

at *3 (C.D. Cal. Oct. 21, 2019) (the limitations period starts "when the plaintiff suffers severe emotional distress as a result of outrageous conduct by the defendant"). None of the allegations come close to conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Potter*, 863 P.2d at 819.

### D. Plaintiffs' breach of contract claims must be dismissed.

Under California law, to claim breach of contract, Plaintiffs must allege their own "performance or excuse for nonperformance." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). This Plaintiffs have not done and cannot do. The Complaint and contract together show that "continual adherence" to the community standards was "a continuing condition of enrollment," Ex.3 at 6; Ex. 4 at 8; Ex.2 at 1, and that Plaintiffs were not performing, FAC ¶¶ 1-3 (acknowledging same-sex marriages). Because Plaintiffs failed to allege this element, and the Complaint and contract foreclose it, the breach of contract claim must be dismissed. *Blades v. Wells Fargo Bank NA*, 2012 WL 2885133, at *2 (D. Nev. July 12, 2012) (dismissing breach of contract claim because allegations contradicted "unambiguous terms" of agreement and plaintiffs had committed a "material breach"); *Haynes v. Navy Fed. Credit Union*, 825 F. Supp. 2d 285, 291 (D.D.C. 2011) (plaintiff "fail[ed] to state a plausible claim for breach of contract" where allegations were "flatly contradicted by the plain language of the parties' agreement") (citing cases). Plaintiffs' "Covenant of Good Faith and Fair Dealing" claim, FAC ¶¶ 238-43, must be dismissed for the same reasons. *Pacific Enters., LLC v. AMCO Ins. Co.*, 2015 WL 56051, at *4 (D. Nev. Jan. 5, 2015).

### E. Plaintiffs' fraud claims must be dismissed.

Count V claims the Seminary committed fraud by representing it would "not discriminate" on sexual orientation and "not discipline students" for entering same-sex marriages. FAC ¶¶ 249-50. Under Rule 8, allegations of fraud must be "plausible." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2012 WL 5447959, at *8 (C.D. Cal. Oct. 4, 2012). But here, Plaintiffs admits the Seminary warned that it "*does* lawfully discriminate on the basis of sexual conduct that violates" the Community Standards. FAC ¶ 191 (emphasis added). Fuller hid nothing. Two elements of the claim also fail for lack of specificity under Rule 9(b). *Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, 2007 WL 2206946, at *5 (S.D. Cal. July 27, 2007) (*misrepresentation*: allegations against a "corporation" are "insufficient"; "plaintiffs must identify the agent," "their authority," and "to whom" they spoke); *id*. at *6 (*intent to defraud*: allegations of "nonperformance" are insufficient to support deceptive intent; must allege fraudulent intent "at the time the statements were originally made").

### F. Plaintiffs' EHEA claims must be dismissed.

The EHEA's nondiscrimination provisions under Section 66270 are subject to an exception for religious organization in Section 66271 that tracks the Title IX religion exemption. *Karasek v. Regents of the Univ. of Calif.*, 2015 WL 8527338, at *18 (N.D. Cal. Dec. 11, 2015) (EHEA and Title IX are construed together). Thus, Plaintiffs' EHEA discrimination claims fail on the grounds that they did for Title IX.

The EHEA nondiscrimination provision also does not apply to the Seminary because, *inter alia*, it does not receive state financial assistance or enroll students who

23

receive state student financial aid. Plaintiffs allege that Fuller receives "state financial assistance" because its students are eligible for reimbursement under California's Student Tuition Recovery Fund ("STRF"), and it contracted with the California Bureau for Private Postsecondary Education ("BPPE") for the BPPE's personnel to review and act on certain complaints concerning the Seminary. FAC ¶¶ 276-79, 281. But state financial assistance is defined, in relevant part, as "any funds or other forms of financial aid appropriated or authorized . . . for the purpose of providing assistance *to any educational institution*[.]" Cal. Educ. Code § 213(a) (emphasis added). The STRF provides reimbursements *to students* of a qualifying institution, not "to [an] educational institution." Similarly, the BPPE does not provide "the services of state personnel" as a form of "financial assistance." Rather, the Seminary *pays* for any work performed under a contract.

Finally, the EHEA notification claims also fail. The Seminary complies with any lawful notice requirements under Education Code Sections 66290.1 and 66290.2 via its publication of the community standards to current and prospective students, faculty members, and employees. While Plaintiffs claim that, under Sections 66290.1 and 66290.2, the Seminary must both provide additional notices to the state for publication on a government website and issue additional statements regarding its community standards, that would violate the First Amendment. Application of the sections in that way would create a targeted speech requirement that expressly applies only to postsecondary institutions claiming *religious* exemptions. *See*, *e.g.*, Cal. Educ. Code § 66290.2 (imposing speech requirement only on schools claiming reli-

gious exemptions under 20 U.S.C. § 1681(a)(3) and Cal. Educ. Code § 66271). Further, there is no analogous speech requirement placed on, for instance, exempt single-sex public undergraduate educational institutions (Section 66278), or exempt educational institutions for the military and merchant marine (Section 66272). Burdens placed solely on the speech of religious institutions are unconstitutional. *Trinity Lutheran*, 137 S. Ct. at 2019 ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment[.]'") (citation omitted); *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371, 2378 (2018) ("compelling individuals to speak a particular message" is "presumptively unconstitutional," and courts are "deeply skeptical of laws 'that distinguish[h] among different speakers'") (citation omitted).

## CONCLUSION

This Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated: February 20, 2020

Respectfully submitted,

BECKET FUND FOR RELIGIOUS LIBERTY

/s/ Daniel Blomberg
DANIEL BLOMBERG
ERIC S. BAXTER
DIANA M. VERM

SOLTMAN, LEVITT, FLAHERTY & WATTLES LLP

/s/ Kevin S. Wattles
KEVIN S. WATTLES

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2020, I electronically filed the foregoing application with the Clerk of Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

/s/ Daniel Blomberg

DANIEL BLOMBERG