**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOANNA MAXON, et al.

Plaintiffs,

vs.

FULLER THEOLOGICAL SEMINARY, et al.

Defendants.

Case No.: 2:19-cv-09969-CBM-MRW

**ORDER RE: MOTION TO DISMISS CASE (DKT. NO. 45)**

JS-6

The matter before the Court is Defendants Fuller Theological Seminary ("FTS"), Marianne Meye Thompson, Mari L. Clements, and Nicole Boymook's (collectively, the "Fuller Defendants") motion to dismiss the operative First Amended Complaint ("FAC"). (*See* Dkt. No. 45 (the "Motion"); Dkt. No. 20 (FAC).)

## I. BACKGROUND

This action concerns the expulsion of two students from a seminary school for violating school policies against same-sex marriage and extramarital sexual activity. Plaintiffs claim violations of: (1) Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"), against FTS; (2) the Unruh Civil Rights Act, Cal. Civ. Code § 51, against the Fuller Defendants; (3) breach of

contract against FTS; (4) intentional infliction of emotional distress against the Fuller Defendants; (5) fraudulent misrepresentation against FTS; and (6) the Equity in Higher Education Act, Cal. Educ. Code §§ 66270, 66290.1-66290.2, against FTS.

**1. Defendant FTS**

FTS is a California nonprofit corporation that offers degrees in theology, intercultural studies, and psychology to its students. (Dkt. No. 20 (FAC) ¶¶ 16, 45.) Students at FTS may attend classes at the main campus in Pasadena, California; regional campuses, including locations in Houston, Texas and the San Francisco Bay Area; or online. (*Id.* at ¶ 43.) Although the school admits students and hires faculty from a variety of faiths, FTS is "religious in nature" and functions as a seminary school. (*Id.* at ¶ 16, 47-49, 69; *see also* Dkt. No. 47, Exh. 1 (Restated Articles of Incorporation) at *1 (describing FTS as "a California nonprofit religious corporation").) FTS is an "independent institution" that is not affiliated with or a subsidiary of a religious denomination or church. (FAC ¶¶ 60-62.)

When prospective students apply to FTS, they must agree in writing not to violate FTS' Community Standards. (Dkt. No. 20, Exh. 1 (Complaint Resolution Report); *see also* Dkt. 47 (Blomberg Decl.), Exh. 3-4 (Application for Admission).) The Community Standards are comprised of multiple policies maintained by the school. The Sexual Standards Policy contained within the Community Standards provides:

> Fuller Theological Seminary believes that sexual union must be reserved for marriage, which is the covenant between one man and one woman, and that sexual abstinence is required for the unmarried. The seminary believes premarital, extramarital, and homosexual forms of explicit sexual conduct to be inconsistent with the teaching of Scripture. Consequently, the seminary expects all members of its community – students, faculty, administrators/managers, staff, and

trustees – to abstain from what it holds to be unbiblical sexual practices.

(FAC at Ex. 1; Blomberg Decl., Exh. 2 (Community Standards) at p. 21.) Although its Non-Discrimination Policy states that FTS does not discriminate based on sex, sexual orientation, marital status, or gender, *inter alia* (FAC ¶ 190), the Policy Against Unlawful Discrimination provides that FTS "does lawfully discriminate on the basis of sexual conduct that violates its biblically based Community Standard Statement on Sexual Standards." (*Id.* at ¶ 191.) FTS also maintains a Title IX Policy which incorporates that statutory prohibition on discrimination based on gender in educational programs that receive federal financial assistance. (*Id.* at ¶ 192.)

**2. FTS Expels Plaintiff Nathan Brittsan**

Plaintiff Nathan Brittsan ("Brittsan") applied to FTS on August 11, 2017, was accepted on August 28, and paid a nonrefundable matriculation/enrollment fee on August 29. (*Id.* at ¶¶ 31-32, 40.) Brittsan accepted his approved financial aid awards, and FTS received the distributed federal student loan funds used to pay Brittsan's tuition. (*Id.* at ¶¶ 34-35.) FTS also granted Brittsan's federally-mandated health insurance waiver by acknowledging that Brittsan was covered by his husband's insurance policy.[1] (*Id.* at ¶ 36.) Brittsan resides in San Jose, California, so he enrolled in and attended classes online and at the FTS regional campus in the San Francisco Bay Area. (*Id.* at ¶¶ 15, 41.) Prior to the start of his classes, Brittsan requested the school to change the last name listed on his student files from "Henning" to "Brittsan." (*Id.* at ¶ 79.)

In early September 2017, Director of Admissions Max Wedel and Professor Kurt Frederickson spoke with Brittsan concerning a perceived Community Standards violation Brittsan committed. (*Id.* at ¶ 87.) Brittsan was not informed that their discussions were part of an investigation by the school. (*Id.* at ¶ 88.)

[1] Brittsan married his husband in 2016. (*Id.* at ¶ 38.)

During the discussion, Dean Wedel and Professor Frederickson urged Brittsan to withdraw his application to FTS and implied that his refusal to withdraw the application would result in blemishes to Brittsan's academic record. (*Id*. at ¶ 89.) Brittsan refused to withdraw and asked Dean Wedel whether his application to FTS had been reversed or denied. (*Id.* at ¶¶ 90-91.) Dean Wedel informed Brittsan his application could not be denied because he was an enrolled student, but the Office of the Dean of the School of Theology would contact him. (*Id.* at ¶ 92.)

On September 21, 2017, two business days before classes started, Defendant Mari L. Clements ("Dean Clements"), Dean of the School of Psychology, sent Brittsan a "Letter of Dismissal" from FTS. (*Id.* at ¶¶ 76-77.) The Letter of Dismissal stated FTS decided to dismiss Brittsan from enrollment because he violated the Sexual Standards Policy. (*Id.* at ¶ 78.) Dean Clements explained to Brittsan that FTS learned of his same-sex marriage when he requested his last name be changed on his student files and that the Department of Admissions determined this was a student-conduct matter. (*Id.* at ¶¶ 79-80.)

Dean Clements directed Brittsan to contact Defendant Nicole Boymook ("Director Boymook"), Executive Director of the Office of Student Concerns, for information concerning his ability to appeal her decision to the Provost. (*Id.* at ¶¶ 85-86.) Director Boymook held a dual role as head of the Office of Student Concerns, which investigates and processes complaints by the institution against students, and Title IX & Discrimination Officer for Students, which investigates complaints of discrimination brought by students against the institution. (*Id.* at ¶ 147.)

On September 25, 2017, Brittsan wrote Director Boymook informing her of his dismissal and asking her how to appeal the decision and whether he could attend classes during the pendency of the appeal. (*Id.* at ¶ 98.) Director Boymook responded the next day that she seeks information regarding his appeal, and did

not tell him to refrain from attending classes. (*Id.* at ¶ 99.) Brittsan attended a class that evening. (*Id.* at ¶ 100.) Director Boymook wrote to Brittsan that he should begin to draft an appeal letter on September 27th, and later informed him the appeal letter should be sent to Bryant L. Meyers, Acting Dean of the School of Intercultural Studies. (*Id.* at ¶ 101.) Brittsan sent an appeal letter to Mr. Myers the next day. (*Id.* at ¶ 102.) In the letter, Brittsan stated he had already invested time and money into his studies, had declined an offer of admission and scholarship to another seminary school in order to attend FTS, and that his dismissal would "set him back a year in his educational studies." (*Id.* at ¶¶ 103-104.) Brittsan requested that FTS allow him to complete the academic quarter so he could transfer to another seminary and stated his belief that the dismissal violated Title IX. (*Id.* at ¶¶ 105-107.) Mr. Myers affirmed the dismissal, and informed Brittsan that FTS had dropped him from classes because "[o]nly matriculated students could take classes while an appeal is heard." (*Id.* at ¶¶ 109-111.) Brittsan was a matriculated student at the time. (*Id.* at ¶¶ 112-114.) Brittsan attended classes for two days, until Director Boymook informed him while he was on the regional campus that he could no longer attend classes during the appeal because he was not matriculated. (*Id.* at ¶¶ 115-117.) At or around this time, FTS backdated Brittsan's student account so that it no longer showed his account was paid and current and instead had a refund of his enrollment fee dated September 8, 2017. (*Id*. at ¶ 118.)

Brittan pursued an appeal of his dismissal throughout October 2017, but was met with resistance and conflict from the school administrators, including Defendant Marianne Meye Thompson ("Defendant Thompson"), Dean of the School of Theology. (*Id.* at ¶¶ 119-46.) Eventually, Brittsan filed a complaint with the U.S. Department of Education, Office of Civil Rights, relating to FTS' refusal to provide him with records of the disciplinary proceeding. (*Id.* at ¶¶ 153-154.)

The Office of Civil Rights informed Brittsan that FTS' response to his requests was inadequate. (*Id.* at ¶ 155.)

**3. FTS Expels Plaintiff Joanna Maxon**

Plaintiff Joanna Maxon ("Maxon") enrolled in the school of theology at FTS in 2015 pursuing a Master of Arts in Theology ("MAT"). (*Id.* at ¶¶ 21, 29.) Because Maxon is a Texas resident, she primarily enrolled in online classes and occasionally attended courses at FTS' regional campus in Houston, Texas. (*Id.* at ¶ 14.) After Maxon enrolled at FTS but before her start date, she divorced her husband and reported to FTS her changed marital status and last name. (*Id.* at ¶¶ 22-24.) Maxon began dating a woman and, after the legalization of same-sex marriage in 2016, married her wife. (*Id.* at ¶¶ 25-26.) Maxon discussed her marriage with faculty and students at FTS, who were supportive of her lifestyle. (*Id.* at ¶ 28.) Maxon and her wife filed a joint tax return in 2016 and authorized the IRS to share her tax return with FTS for the purposes of financial aid. (*Id.* at ¶ 26.)

On August 29, 2018, Director Boymook submitted a Complaint Resolution Report regarding a complaint against Maxon from the Office of Student Financial Services ("OSFS"). (*Id.* at ¶ 161.) Although FTS did not provide a copy of the complaint to Maxon, the Complaint Resolution Report stated the basis of the complaint was that Maxon's 2016 income tax return was received by OSFS and indicated Maxon was married to another female, and Maxon acknowledge her marriage during a telephone call with Director Boymook. (*Id.* at ¶ 162.) On September 20, 2018, one business day before classes began, Director Boymook provided Maxon the Complaint Resolution Report and told Maxon she could respond in writing whether she accepted the findings in the report. (*Id.* at ¶ 168.) The report did not contain interviews with Maxon's wife, children, or other witnesses and did not contain a recommendation for action. (*Id.* at ¶¶ 169-170.)

In a letter to Dean Thompson, Maxon responded to the report by admitting she was in a same-sex marriage but without stating she engaged in "homosexual forms of explicit sexual conduct." (*Id.* at ¶¶ 171-173.) On October 9, 2018, Dean Thompson sent a letter to Maxon informing her she was dismissed from FTS effective immediately for violating the Sexual Standard Policy of the Community Standard. (*Id.* at ¶¶ 176-177.)

## II. JURISDICTION

The Court has jurisdiction over this action under Title IX of the Education Amendment Act of 1976.

## III. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Allegations in the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court is obligated to "take all of the factual allegations in the complaint as true." *Id.* at 679. A formulaic recitation of the elements of a cause of action will not suffice and labels and conclusions are insufficient. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV. DISCUSSION

### A. The Fuller Defendants' Request for Judicial Notice and Documents Incorporated by Reference

The Fuller Defendants request judicial notice of FTS' Articles of Incorporation, filed March 24, 1997. (Dkt. No. 48.) Plaintiffs filed a notice of non-opposition to the request. Courts may take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005); *see also* Fed. R. Evid. 201(b). Here, the articles of incorporation are a public record taken from the website of the office for

the Secretary of State of California. Accordingly, the Court **GRANTS** the request for judicial notice.

FTS also submits a declaration from its counsel, Mr. Daniel Blomberg, attaching exhibits which he declares are true and correct copies of:

- The Community Standards section of the FTS website (Exhibit 2);
- Plaintiff Maxon's application to FTS (Exhibit 3);
- Plaintiff Brittsan's application to FTS (Exhibit 4);
- A letter sent from Defendant Marianne Meye Thompson to Plaintiff Brittsan dated October 13, 2017 (Exhibit 5);
- A series of e-mails sent between Plaintiff Brittsan, Defendant Nicole Boymook, and FTS employees (Exhibit 6);
- A letter from Defendant Mari L. Clements to Plaintiff Brittsan dated September 21, 2017 (Exhibit 7);
- A letter sent from Plaintiff Brittsan to Dr. Bryant Myers dated September 28, 2017 (Exhibit 8);
- A letter from Plaintiff Maxon to Defendant Marianne Meye Thompson (Exhibit 9);
- A letter from Defendant Marianne Meye Thompson to Plaintiff Maxon dated October 9, 2018 (Exhibit 10); and
- A ruling on Plaintiff's Motion for Summary Adjudication and Defendants' Motion for Summary Judgment in *Cabading v. California Baptist University.*

Documents not attached to the complaint may be considered by the Court under the doctrine of incorporation by reference if no party questions their authenticity and the complaint relies on those documents. *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

Here, the FAC heavily relies on Exhibits 2 through 10. Plaintiffs have not challenged the authenticity of those documents. Of particular significance is

Exhibit 2, the Community Standards of FTS. (*See* Blomberg Decl., at Ex. 2.) The FAC attaches a section of the Community Standards as an exhibit and, as indicated in the Blomberg Declaration, relies on the Community Standards throughout its text. (*See* Blomberg Decl. at ¶ 4 (citing FAC at ¶¶ 78, 84, 87, 88, 109, 130, 133, 162, 163, 180, 191, 193, 200, 220, 226, 238, 239, 244, 247, 248, 273); *see also* FAC at Ex. 1.) In their Opposition, Plaintiffs "reject [the Fuller Defendants'] reliance on Exhs. 2-10," contending those exhibits are "evidence and facts outside the Complaint. Such reliance is inappropriate on a Motion to Dismiss because the Court and parties are limited to analyzing the allegations contained in the pleadings." (Opp. at p. 2, n.1.) Because the doctrine of incorporation by reference applies, the exhibits considered by the Court are within the FAC. *See Harris*, 682 F.3d at 1132. The FAC does not rely on Exhibit 1, but the Court takes judicial notice of that document as a public record, without objection by Plaintiff.

Therefore, Exhibits 2 through 10 are incorporated by reference into the FAC.

**B. The Fuller Defendants' Motion to Dismiss**

**1. Plaintiffs' claims are within the scope of Title IX**

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a) ("Section 1681").

Section 1681 prohibits discrimination under any education program or activity receiving Federal financial assistance "on the basis of sex." 20 U.S.C. § 1681(a). Congress enacted Title IX to avoid using federal resources to support discriminatory practices and to provide citizens with protection against those practices. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). The Ninth Circuit has held that similar substantive standards apply between Title VII and Title IX. *See Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012)

(ruling that the legislative history of Title IX "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII."). The prohibition of sex discrimination under Title VII encompasses both discrimination based on biological sex and gender stereotypes. *See Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) ("Discrimination because one fails to act in the way expected of a man or women is forbidden under Title VII."). In its recent decision in *Bostock v. Clayton County*, ---- U.S. ----, 140 S.Ct. 1731, 1741 (2020), the United States Supreme Court held discrimination based on "sex" under Title VII encompasses discrimination based on sexual orientation "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."

Plaintiffs allege FTS discriminated against them on the basis of sex because "[i]t is stereotypical for a female to marry a male." (FAC ¶ 205). Therefore, FTS treated Brittsan "differently than a similarly situated female" because "if [he] was female, [FTS] would not have expelled him for marrying a male." (*Id.* at ¶¶ 203-204.) Similarly, Plaintiffs allege FTS treated Maxon "differently than a similarly situated male" because "if [she] was male, [FTS] would not have expelled her for marrying a female." (*Id.* at ¶¶ 206-207.)

FTS argues Plaintiffs' interpretation of the phrase "sex" in Title IX impermissibly expands the scope of the statute to encompass sexual orientation, "an entirely distinct concept" that Congress did not intend to include in Title IX's prohibitions. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523, n.13 (1982) ("Title IX grew out of hearings on gender discrimination in education."); *see also Texas v. United States*, 201 F. Supp. 3d 810, 832-833 (N.D. Tex. 2016) ("It cannot be disputed that the plain meaning of the term sex as in § 106.33 when it was enacted by the DOE following passage of Title IX meant the biological and

anatomical differences between male and female students as determined at their birth.”).

Here, the Court finds that Title IX’s prohibition of discrimination on the basis of gender stereotypes encompasses educational institutions that discriminate against an individual for marrying a person of the same sex. Plaintiffs allege that they were treated differently than similarly situated persons of the opposite sex based on the stereotype that men are married to women. It is undisputed that Plaintiffs would not have been expelled if they were the opposite gender and married the same spouse. Under these facts, it is impossible to distinguish between discrimination on the basis of “gender stereotypes” and discrimination on the basis of “sexual orientation.” *See Videckis v. Pepperdine University*, 150 F. Supp. 3d 1151, 1159 (C.D. Cal. 2015) (“Simply put, the line between sex discrimination and sexual orientation discrimination is ‘difficult to draw’ because that line does not exist, save as a lingering and faulty judicial construct.”). Therefore, Plaintiffs have adequately alleged a Title IX claim for discrimination on the basis of gender. *See Onacle v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (“The critical issue, Title VII’s text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.”); *see also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1067 (9th Cir. 2002) (holding “discrimination can take place between members of the same sex, not merely between members of the opposite sex.”)

**2. The Religious Organization Exemption of Title IX, 20 U.S.C. §§ 1681, *et seq.* (Count 1)**

**a. The Religious Organization Exemption**

The prohibitions of Section 1681 do not apply “to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization[.]” 20

U.S.C. § 1681(a)(3) (the "Religious Organization Exemption"). The regulations related to this exemption provide that "[a]n educational institution which wishes to claim the exemption … shall do so by submitting in writing to the Assistant Secretary [of the Department of Education] a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization." 34 C.F.R. § 106.12.

Two issues are presented regarding the application of the Religious Organization Exemption to FTS: (1) whether FTS was required to submit in writing its claim of exemption to the Department of Education to avail itself of the Religious Organization Exemption; and (2) whether FTS "is controlled by a religious organization" such that it meets the statutory requirements of the Religious Organization Exemption. These are considered in turn.

**i. FTS was not required to provide written notice to the Department of Education as a prerequisite to asserting the Religious Organization Exemption in court.**

*First*, Plaintiffs allege FTS did not apply for or receive a religious exemption from the Department of Education and therefore cannot claim the Religious Organization Exemption now. (FAC ¶ 5.) The Fuller Defendants argue it is irrelevant whether FTS received an exemption from the Department of Education because the language of the statute and the Department of Education's interpretation thereof do not require an educational institution to apply for an exemption to avail itself of the Religious Organization Exemption.

Plaintiffs argue 34 C.F.R. § 106.12 required FTS to apply for or receive an exemption to avail itself of the Religious Organization Exemption in this case. Plaintiffs interpret the regulation to impose a mandatory process to which an educational institution must adhere as a prerequisite for claiming the exemption. That interpretation, however, would contradict the plain language of the Religious

Organization Exemption, which automatically exempts from the prohibitions of Section 1681 any educational institution that meets the statutory criteria for the exemption. Moreover, after the close of briefing in this case, 34 C.F.R. § 106.12(b) was amended to provide in relevant part that "[a]n institution is not required to seek assurance from the Assistant Secretary [of the Department of Education] in order to assert such an exemption." *See* 85 Fed. Reg. 30026, 200475 (May 19, 2020). This amendment supports this Court's interpretation of the Religious Organization Exemption. Therefore, the Court rejects Plaintiffs' interpretation of 34 C.F.R § 106.12 because to do so would contradict the intent of Congress, as evidenced by the plain language of Section 1681. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Construing the language of the statute, the Religious Organization Exemption does not condition an educational institution's liability under Section 1681 on its submission of a written claim for exemption. A plain reading of Section 1681 together with the Religious Organization Exemption indicates that the prohibition of sexual discrimination provided by Section 1681 "shall not apply" to an educational institution if it "is controlled by a religious organization" and "application of this subsection would not be consistent with the religious tenets of such organization[.]" 20 U.S.C. § 1681. If these elements are met, then by its own terms Section 1681 does not apply to the educational institution.

**ii. FTS is "controlled by a religious organization."**

*Second*, Plaintiffs contend the Religious Organization Exemption does not apply because FTS is not "controlled by a religious organization" as required by the statute, *see* 20 U.S.C. § 1681(a)(3), and is instead controlled by its board of directors. FTS argues the requirement of religious control is satisfied because FTS

is "both an educational institution and a religious organization and is controlled by its religious board of trustees." (Mot. at p. 6:20-22.) Alternatively, FTS contends it qualifies for the Religious Organization Exemption under the Department of Education's interpretation of the statute.

Plaintiffs argue a plain reading of the statutory language of the Religious Organization Exemption reveals that Congress intended two separate entities to be involved: "an educational institution" and "a religious organization." *See* 20 U.S.C. § 1681. The broad definition of "educational institution" given by the statute includes "any institution of vocational, professional, or higher education," such as FTS.[2] The statute does not define "religious organization." Under Plaintiff's interpretation of the statute, the "religious organization" must be distinct from the "educational institution" for it to exert the requisite control.

Plaintiffs argue their interpretation of the control test is supported by comparing it to an analogous religious exemption contained in Title VII, exempting an educational institution that is "in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or religious corporation, association, or society[.]" 42 U.S.C. § 2000e-2(e). Because Congress was capable of crafting a broad religious exemption in Title VII but chose not to do so in Title IX by omitting the words "religion" and "religious organization," Plaintiffs argue the Court should infer Congress intended to narrow the Religious Organization Exemption. Plaintiffs argue a narrow interpretation of the Religious Organization Exemption is also supported by legislative history, wherein the Congress twice rejected proposals to broaden the scope of the exemption. *See* S. Rep. 100-64 (1987), 1987 WL 61447, S. Rep. No. 64, 100th

[2] "Educational institution" is defined as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c).

Cong., 1st Sess. 1987 (rejecting amendment "to loosen the standard for the Religious Organization Exemption from "controlled by a religious organization" to "closely identified with the tenets of a religious organization" because of concern "that any loosening of the standard for application of the religious exemption could open a giant loophole and lead to widespread discrimination in education."); 134 Cong. Rec. H565-02 (1988), 1988 WL 1083034 (rejecting amendment to "extend the exemption to schools that are 'closely identified with the tenets of a religious organization.' ").

FTS argues a plain reading of the Religious Organization Exemption does not require the kind of separation between the "religious organization" and "educational institution" proposed by Plaintiffs, that a broad reading of the exemption is supported by the interpretation of the statute adopted by the Department of Education, and that neither Title VII nor legislative history supports Plaintiffs' interpretation. Addressing statutory interpretation, FTS argues that under its "ordinary meaning," an "organization" is any "organized body, system, or society." Oxford English Dictionary (2d ed. 1989); *see also Animal Legal Def. Fund v. USDA*, 933 F.3d 1088, 1093 (9th Cir. 2019) (applying the definition for "individual" provided by the Oxford English Dictionary where statute did not define the term and the term's "ordinary meaning" controlled). Therefore, FTS argues, the ordinary meaning of a "religious organization" broadly includes the religious board of directors of FTS, and does not require "a separately incorporated, entirely unrelated entity" as Plaintiffs propose. (Reply at p. 2:1-11.)

FTS further argues that, to the extent there is ambiguity in the Religious Organization Exemption, the interpretation of the statute given by the Department of Education should control. This interpretation is provided in the Memorandum of Harry M. Singleton, Assistant Secretary for Civil Rights, to Regional Civil Rights Directors, Feb. 19, 1985 ("Singleton Memo"), in which the Department of Education stated its policy that "an applicant or recipient will normally be

considered to be controlled by a religious organization if" the educational institution is "a school or department of divinity" or "requires its faculty, students or employees to be members of, or otherwise espouse a personal belief in, the religion of the organization by which it claims to be controlled."[3] Addressing Title VII and the legislative history of proposed amendments, FTS argues Congress did not adopt amendments to expand the scope of the Religious Organization Exemption because any amendments were unnecessary given the Department of Education's expansive interpretation of the statute by adopting the Singleton Memo. Furthermore, FTS argues any comparison to Title VII's broad religious exemption should favor a broad interpretation of the Religious Organization Exemption provided by Title IX because the "well-established canon of statutory interpretation *in pari materia*, that similar provisions in the same statute should be interpreted in a similar manner unless legislative history or purpose suggests material differences." *In re Joye*, 578 F.3d 1070, 1076, n.1 (9th Cir. 2009) (citation omitted).

Here, although the text of the Religious Organization Exemption may be read to require the "religious organization" and "educational institution" to be two separate entities, the ordinary meaning of the term "organization" is sufficiently broad to include the board of directors. Furthermore, the board of directors exerts control over FTS, as they are responsible for implementing the policies at issue.

---

[3] The full text of the relevant portion of the Singleton Memo provides:

> [A]n applicant or recipient will normally be considered to be controlled by a religious organization if one or more of the following conditions prevail: (1) It is a school or department of divinity; or (2) It requires its faculty, students or employees to be members of, or otherwise espouse a personal belief in, the religion of the organization by which it claims to be controlled; or (3) Its charter and catalog, or other official publication, contains explicit statement that it is controlled by a religious organization or an organ thereof or is committed to the doctrines of a particular faith, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives significant amount of financial support from the controlling religious organization or an organ thereof.

(FAC ¶ 133.) This interpretation of the Religious Organization Exemption does not contradict its legislative history, as Congress may not have adopted amendments broadening the language of the "controlled by" section of the statute because the Department of Education interpreted that section expansively, rendering further amendment unnecessary. In any event, reliance on subsequent legislative history has inherent "difficulties," *see Sullivan v. Finkelstein*, 496 U.S. 617, 628, n.8 (1990) (*citing U.S. v. United Mine Workers*, 330 U.S. 258, 281-82 (1947)), making it difficult to determine the intent of Congress by its failure to amend the statute.

Furthermore, to the extent that the interpretation of the Religious Organization Exemption proposed by either side is reasonable, then the statute may be ambiguous. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Department of Education construes the Religious Organization Exemption in the manner described in the Singleton Memo, which is reasonable considering the apparent ambiguity of the term "religious organization." FTS, as a seminary, plainly qualifies as a "department of divinity" under the DOE's test.

**iii. Application of Title IX violates FTS's religious tenets**

For the Religious Organization Exemption to apply, application of Section 1681's prohibition of gender discrimination must "not be consistent with the religious tenets" of FTS. The FAC alleges FTS violated Title IX by expelling Plaintiffs because they are married to a partner of the same gender. (FAC ¶¶ 2 ("Now, after suddenly being expelled because of her same-sex marriage, Joanna has to repay those loans and to reassess her professional goals."), 3 ("After being expelled because of his same-sex marriage, Nathan's education was delayed by a year.").) FTS expelled Plaintiffs because it determined their same-sex marriage violated the Sexual Standards Policy, which defines marriage as "the covenant

between one man and one woman" and prohibits sexual activity outside the confines of marriage, based on its interpretation of the Bible. (Blomberg Decl., Exh. 2 (Community Standards) at p. 21.)

Plaintiffs argue that dismissal of the Complaint is inappropriate because "discovery may show that Title IX's prohibition on expelling [Plaintiffs] because of their same-sex marriages would not violate [FTS's] religious beliefs." (Opp. at p. 11:10-16.) Plaintiffs suggest that "discovery may demonstrate that [Plaintiffs'] expulsions were based on the personal animus of a couple of administrators, rather than on [FTS's] religious beliefs" considering the "seemingly contradictory policies and practices on non-discrimination, Title IX, the admission of LGBTQ students and sexual conduct" adopted by FTS. (Id. at p. 11:16-20.) This argument fails. Although Plaintiffs allege that same-sex marriage does not violate the policies of FTS (*see* FAC ¶ 231) and that the Fuller Defendants never asked Plaintiffs whether they engaged in homosexual activities with their respective spouses (*see id*. at ¶¶ 82-83, 163), the Sexual Standards Policy limits its definition of marriage to a heterosexual union and prohibits extramarital sex. FTS interpreted this policy to mean that same-sex marriages violate the religious tenets of the school. The Court is not permitted to scrutinize the interpretation FTS gives to its religious beliefs. *See Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("[I]nquiry into … religious views … is not only unnecessary but also offensive. It is well established … that courts should refrain from trolling through a person's or institution's religious beliefs.").

Furthermore, although the Religious Organization Exemption may not apply where a religious justification is given for an allegedly retaliatory termination, such as in *Goodman v. Archbishop Curley High School, Inc.*, 149 F. Supp. 3d 577, 586 (D. Md. 2016) (holding the Religious Organization Exemption did not bar a retaliation claim), on which Plaintiffs rely, the reasoning is that discovery may reveal a non-religious pretext for termination, rather than an

inconsistency in religious doctrine. Unlike *Goodman*, Plaintiffs did not plead a retaliation claim, and the discovery Plaintiffs seek would bear directly on the consistency of FTS's religious beliefs.

Therefore, the Title IX claim seeks to hold FTS liable for expelling Plaintiffs for entering same-sex marriages, which are contrary to the school's religious tenets. Thus, the Religious Organization Exemption applies.

## V. CONCLUSION

The Court **GRANTS** the motion to dismiss. Count One, for violation of Title IX, is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the remaining claims of the FAC.[4] Therefore, Counts Two, Three, Four, Five, and Six are dismissed without prejudice to permit Plaintiffs to file in state court.

**IT IS SO ORDERED.**

DATED: October 7, 2020

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[4] Having dismissed Plaintiffs' claim for violation of Title IX with prejudice, this Court declines to exercise supplemental jurisdiction over the remaining claims, which are grounded in state law. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."); *see also Exec. Software N. Am., Inc. v. U.S. Dist. Ct.*, 24 F.3d 1545, 1553 n.4 (9th Cir. 1994) ("[I]f the federal claims are dismissed before trial … the state claims should be dismissed as well," *Gibbs*, 383 U.S. at 726[.]")